IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HERITAGE DISPOSAL AND STORAGE, LLC | ) Case No. 19-40297 |
| | ) |
| Debtor. | ) |
| | ) |

## FIVE POINTS BANK'S MOTION FOR ADEQUATE PROTECTION AND FOR RELIEF FROM THE AUTOMATIC STAY

COMES NOW Five Points Bank, a secured creditor herein ("Five Points") and moves this Court for an order granting Five Points adequate protection under 11 U.S. C. § 361 or alternatively, relief from the automatic stay pursuant to 11 U.S.C. § 362(d) to allow it to foreclose on its collateral. In support of its motion, Five Points states as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter under 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(A), (B), and (G).

2. The statutory basis for the relief requested herein are Sections 361 and 362(d) of the Bankruptcy Code. Venue is proper in this Court pursuant to 28 U.S. C. § 1409(a)

### FACTUAL BACKGROUND

3. As of the Petition Date, the Debtor was indebted to Five Points in the amounts set forth below (the "Five Points Loans").

| Loan No. | Principal | Interest as of March 26, 2019 | Fees and/or Late Charges | Total | Per Diem |
|---|---|---|---|---|---|
| 101260351 | $2,795,362.08 | $369,681.34 | $500.00 | $3,165,543.42 | $504.72 |
| 101274613 | $35,168.19 | $4,762.35 | $0 | $39,930.54 | $6.35 |
| 101313016 | $250,000.00 | $14,805.55 | $0 | $264,805.55 | $45.14 |
| 101271199 | $663.10 | $15.92 | $32.86 | $711.88 | $.12 |
| Total | $3,081,193.37 | $389,265.16 | $532.86 | $3,470,991.39 | $556.33 |

Kelley Declaration at ¶ 3.

4.   Five Points holds first-priority deeds of trust (the "Five Points Deeds of Trust") on Debtor's real estate, which is more particularly described in the Five Points Deeds of Trust attached to Five Points' Proof of Claim, Claim No. 10 filed herein. See Declaration of Thomas O. Kelley ("Kelley Declaration"), ¶¶ 2, 4, Exhibit A, Proof of Claim, Part 4.  The Five Points Deeds of Trust were each properly recorded with the Hall County Recorder's Office. Debtor does not challenge Five Points' lien position in this real estate. See Debtor's Amended Schedule D, Doc. No. 25.

5.   Five Points also holds a first priority security interest in all of Debtor's personal property.  See Kelley Declaration at ¶ 2, Exhibit A Part 3.

6.   Other than minimal payments of $657.26 through monthly auto-withdrawals that ended in November 2018, Five Points has received only one small principal payment of $75,528.00 since March of 2018.  See Kelley Declaration at ¶ 6.

7.   Prior to the Petition Date, the Debtor defaulted on the Five Points Loans by failing to make the payments when due. Those defaults also constituted defaults under Five Points Deeds of Trust and Security Agreements and as such, Five Points

commenced a non-judicial foreclosure of the Five Points Deeds of Trust, which was stayed by the filing of this case. See Kelley Declaration at ¶ 7.

8.  On February 27, 2019 (the "Petition Date"), Debtor filed this bankruptcy.

9.  On April 12, 2019, the first meeting of the creditors was held ("First Meeting"). At the First Meeting, the Debtor's president, Mark Vess testified for the Debtor. First Meeting of Creditor's Transcript (hereinafter "TR"), TR at 4:5-17.

10.  The pertinent portions of Mr. Vess' testimony are summarized below, and the complete transcript is attached as Exhibit "A" to the Declaration of James J. Niemeier, submitted in support of this Motion (the "Niemeier Declaration").

   a.  <u>Debtor's Prior Business and New Business Ventures</u>. Mr. Mark Vess is the Debtor's president and testified for it at the First Meeting. The Debtor was formed in 2003, and the original purpose of the company was to support the U.S. Departments of Justice's and Treasury's seized property programs. The company managed illegal firearms, explosive, illegal fireworks from 2004 until 2015. TR at 5:1-6:12. In 2015, the Debtor contracted to become a small business prime contractor for the Department of Defense conventional demil program to allow it to construct a facility for recycling and destruction of conventional munitions. *Id.* Mr. Vess testified the Debtor was in negotiations to obtain debtor-in-possession financing to build the plant to perform this Department of Defense work and was looking for $6,600,000.00 to fund construction and startup, and that they were working on the term sheet as of the First Meeting. He further testified he was confident the financing would get done. TR at 6:12-8:25. If that occurred, Mr. Vess testified that he hoped to have a "running facility" by October or November of 2019. TR 8:1-17. Mr. Vess also testified at the First Meeting that

the Debtor has no ongoing contracts with the U.S. Government or any other entity beyond the above-described contract with the Department of Defense. However, that contract requires the financing described above to construct the equipment and processing line needed to perform the contracted tasks. So at this time, there are no income providing contracts for the Debtor. TR at 61:4-62:4. As of the First Meeting, in Mr. Vess' words, the Debtor had no "contract income that we're qualified to receive as of the filing of the bankruptcy." TR at 20:15-21.

      b.      <u>Need for Financing</u>. Mr. Vess testified that he would need $6.6 million of debtor-in-possession financing to fund the new processing line to perform the contract with the Department of Defense. TR at 7:22-25. Heritage has been actively looking for financing since September of 2016. TR at 78:1-9. During that period, several parties expressed interest, but nothing materialized. TR at 78:1-83:9. Finally, Mr. Vess testified absent debtor-in-possession financing, no income would be coming into Heritage. TR at 84:24-85:4. This is supported by the Debtor's First Operating Report [Docket No. 53] which shows zero cash in February 2019, the deposit of the net farm rental proceeds received in March 2019, which will not recur in 2019, and only $21,513.00 of cash left as of April 30, 2019 to maintain what Debtor claims in that operating report are over $14 million of assets. Operating Report, Docket No. 53 at pp. 2-3.  The Debtor also testified that even if financing were obtained it would require approximately six months of time to make the facility sufficiently operational to start work under the Department of Defense contract.  TR 73:11 - 75:15.

      c.      <u>Storage of Potentially Hazardous Materials</u>. Heritage is also currently storing some 600,000 pounds of partially recycled explosive material in

4

drums at its facility. TR 52:21-53:10. These are the remnants of Heritage's last recycling endeavor with the Department of Justice and Treasury that sought to recycle seized fireworks and explosives into fertilizer. TR 15-20-19:10. Heritage was unable to fully recycle these into sellable fertilizer or other materials due to lack of funds. The material is stored in drums or totes at the property, and is only partially recycled, and while no longer "energetic" or explosive, nevertheless unsellable without "the better part of a million dollars" for further processing or disposal. TR 55:1-56:5. Discussing the materials stored in these totes, Mr. Vess further testified they remain subject to regulatory controls consistent with hazardous materials stating, "to be clear, so that you understand, any materials that are released from Heritage, they have to have third-party MSDS prepared, and it has to meet all requirements for recycled materials." TR 54:9-19. He also testified he did not know the constituency of the drums in their partially recycled state, stating: "so the point is when it is no longer energetic material and you have a tote full of constituents that you're half – that's halfway to being fertilizer, what the actual source materials that's in that tote is  -- is anybody's guess." TR 114:12-17.

    d.    <u>Insurance</u>. As of the First Meeting, Mr. Vess did not know if Heritage still had insurance coverage. TR at 28:10-31:23. Since the First Meeting, Debtor's counsel has reported that Debtor has some basic hazard and liability coverages, however, the Debtor's property is in a flood plain and no flood insurance has been obtained as of the filing of this motion to Five Points' knowledge. Each of Five Points' Deeds of Trust require flood insurance. See Kelley Declaration, Exhibit "A" at Part 4, pp. 2-3; 13-14; 25, 35, 48, 62.

5

11. Five Points was notified post-petition that Debtor's flood insurance was cancelled, and Five Points' counsel contacted Debtor's counsel and requested Debtor cure that default and obtain flood insurance. Kelley Declaration, ¶ 8, Niemeier Declaration ¶ 3, Exhibit "B." The Debtor's property is in a flood plain and Five Points is required to ensure that its borrowers who have collateral in a flood plain maintain flood insurance on those properties. The Five Points Deeds of Trust specifically required this quoting:

> "The Real Property is or will be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood area. Trustee agrees to obtain and maintain federal flood insurance; if available, for the full unpaid balance of the loans and any prior liens on the property securing the loan up to the minimum policy limits set under the National Flood Insurance Program or as otherwise required by Lender and to maintain such insurance for the term of the loan."

See e.g., Kelley Declaration Exhibit "A" at p. 48. The lack of flood insurance has been raised by Five Points regulators which are requiring it to be addressed. Kelly Declaration at ¶ 8.

12. Five Points' counsel first inquired by telephone regarding the flood insurance in April of 2019. On April 25, 2019, Debtor's counsel advised via email that the insurance was being "worked on." Five Points' counsel again inquired about flood insurance on May 3, May 9, and May 13, 2019, but as of the filing of this motion a month later, no flood insurance has not been obtained to Five Points' knowledge. Niemeier Declaration ¶ 3 Exhibit "B." Further, based on the operating report, Debtor has limited funds to provide the required coverage.

13.     The Debtor agreed under the Five Points Deeds of Trust to allow Five Points access to its facilities to conduct inspections. See, e.g., Kelley Declaration, Exhibit "A" at Part 4, p. 2 of 71 of claims under "Lender's Right to Enter."

14.     Five Points' counsel requested access to inspect the property to allow Five Points' appraiser to do a valuation of the same and to allow a licensed environmental consulting firm it has retained to do limited testing of the materials stored at the Debtor's property to determine if it is hazardous, has potential value, and an estimate of its disposal cost if it has to be removed.  Finally, Five Points' counsel has repeatedly asked Debtor's counsel for the status of the debtor-in-possession financing that is crucial to Debtor's ability to emerge from this case. Debtor's counsel's communications on these issues indicated the efforts to obtain the financing the Debtor testified about at the First Meeting had fallen through. See Niemeier Declaration ¶ 3 Exhibit "B."  As of the date of the filing of this motion, no debtor-in-possession financing has been obtained.

15.     As of the filing of this motion, the Debtor has refused to allow access for the requested inspections without a series of conditions including allowing the Debtor to control the process for the inspections, control the manner and volume of sampling, pay the Debtor to hire additional staff to allow the inspections to occur, all in addition to paying for the testing and inspection themselves, which are expensive.

## REQUESTED RELIEF

### I.     Request for Adequate Protection

16.     Five Points requests the Court grant it adequate protection as follows:

(a)     Requiring the Debtor immediately obtain the required flood insurance for the property;

7

    (b)    Requiring the Debtor to allow Five Points' appraiser and its licensed environmental consultants reasonable access to the property for the appraisal of the property and to sample and inspect a portion of the totes' containing the stored partially recycled explosive material as such consultants deem appropriate to determine if the sampled totes' contents are hazardous and obtain an independent estimate of their value and/or disposal cost.

17.    11 U.S.C. § 361 requires the Debtor provide Five Points adequate protection for its liens covering the real property. Insurance is one of the requirements under the terms of the Debtor's Deed of Trust and because the Debtor is in a flood plain it should reasonably be required to maintain flood insurance during the pendency of this case. See, *In re Marchand*, 61 B.R. 81, 83 (Bankr. ED. Ark. 1986)(requiring debtor to insure collateral as a basic form of adequate protection). *In re Schroeder*, 62 B.R. 604, 607, (Bankr. D. Kan 1986) (similar requiring debtor to insure collateral as adequate protection) to avoid stay relief.

18.    In addition, the Debtor should be required to provide access to its property to be inspected and appraised, and also access to the totes storing partially recycled explosive materials from Debtor's prior recycling activities to allow Five Points' licensed environmental consultants access to take limited samples and test them to determine what substances they contain, if the contents is hazardous, and the reasonable cost to remove and/or sell or depose of this material as appropriate. The value of Debtor's real estate collateral could be materially reduced if the material stored at the property proves to be hazardous, because absent financing, which seems unlikely or a sale which has not been pursued in this case, the Debtor has no reasonable means to dispose of the materials it has. As such, it will be left to the estate or more likely Five Points due to its

8

lien positions to deal with same. For these reasons, Five Points submits access should be allowed to determine the true risk and value of this partially recycled material.

## II.   Relief From The Automatic Stay

19.  Section 362(d) of the Bankruptcy Code provides the circumstances under which a creditor may obtain relief from the automatic stay. Its states:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-----
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
> > (2) with respect to a stay of an act against property under subsection (a) of this section, if ---
> > a.  the debtor does not have an equity in such property; and
> > b.  such property is not necessary to an effective reorganization:…

20.  Five Points submits cause exists under § 362(d)(1) to grant it relief from the stay in this case because:

(a)   There is potentially limited or no equity in the Debtor's property unless it can be sold as going concern, but unfortunately as discussed below the Debtor has no current operations and no financing in place or on the horizon to finance its venture as discussed herein.

(b)   The Debtor has failed to maintain flood insurance in violation of the terms of the Five Points Deeds of Trust.

(b)   The Debtor is almost out of money, has no post-petition financing lined up or in place, has no ongoing income, and has minimal cash reserves.

(c)   The Debtor's prior operations consisted of contracts for reclaiming and recycling fireworks and other explosives for the ATF into fertilizer. Meanwhile, the Debtor never completely reclaimed and recycled the ATF

9

fireworks under those contracts. That has left Debtor storing some 600,000 pounds of an unknown partially reclaimed product from that recycling process at its facility in totes that according to the Debtor's testimony requires millions of dollars of financing to complete its processing. TR at 55:1-56:5.

(d) The Debtor has refused to allow Five Points reasonable access to obtain an appraisal of its real property collateral and to test the material it is storing on its property to determine if the Debtor is storing hazardous materials at the property that serves as Five Points' collateral thereby potentially substantially devalving the same.

(e) Absent financing which has not been obtained despite the Debtor's testimony that it has been looking for such financing since 2016, there is no way for the Debtor's operations to continue. Reorganization is simply not possible and all the Debtor's good intentions to make the new venture work does not change that fact. *See In re Bowman*, 253 B.R. 233, 239 (8th Cir BAP 2000) (noting the test requires there be a practical possibility for the reorganization to be successful, "sincerity, honesty and willingness" are not sufficient to meet that test nor are "visionary promises.")

21. The Debtor's schedules list an equity cushion; however, Five Points submits no equity cushion or a very small one exists. In reality, the property is currently storing 600,000 pounds of an unknown partially recycled explosive material. The Debtor has not allowed Five Points access to inspect or to do limited testing to identify if it is hazardous. The Debtor has virtually no money to reorganize with, has been searching for financing since at least 2016, and currently has no commitments for the financing needed to allow it to undertake the contract with the Department of Defense which is its

only potential income source. The Debtor by its own admission will need until the end of the year to start production under the Department of Defense contract even if such financing were obtained now. The Debtor will need six to eight months absent financing and over a million dollars to clean up the stored material according to Mr. Vess to sell or otherwise market its business as a fall back plan, and the likelihood of successfully marketing the specialized explosive recycling facility Debtor's valuations are based on in its current incomplete state is highly suspect.

22.   In summary, the high value for Debtor's property stated in the Debtor's schedules is questionable given all the issues surrounding the stored materials. Five Points submits there is a likelihood there is no equity in the facility above Five Points' liens, and that an effective reorganization is highly unlikely given the total lack of financing or income for the venture at this point. For these reasons, there is no equity in the property and it is not necessary for an effective reorganization and as such, relief from the automatic stay is justified under 11 U.S.C. § 362(d)(2).

### III.     Request for Waiver of Stay Order Under Fed. R. Bankr. P. 4001(A)(3)

23.   Five Points also respectfully requests a waiver of the 14-day stay of effectiveness imposed by Fed. R. Bankr. P. 4001(a)(3) so that the relief requested herein may take effect immediately upon entry of an order approving Five Points' Request for Stay Relief.

WHEREFORE, Five Points Bank respectfully requests the entry of an order (1) granting Five Points the adequate protection required herein; (2) or alternatively, granting Five Points Bank relief from the automatic stay so that it may foreclose on its collateral; (3) granting a waiver of the 14-day stay under Fed. R. Bankr. P. 4001(a)(3); and (4) granting such other and further relief as is just and proper.

DATED this 22nd day of May 2019.

        Five Points Bank, a secured creditor,

        By: */s/ James J. Niemeier*
        James J. Niemeier, Esq., #18838
        McGrath North Mullin & Kratz, PC, LLO
        Ste. 3700 First National Tower
        1601 Dodge Street
        Omaha, NE 68102
        402-341-3070
        jniemeier@mcgrathnorth.com
        Attorneys for Five Points Bank

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was served by electronic filing utilizing the Court's CM/ECF system which gave notification electronically upon all parties who have filed an appearance or motion by electronic filing in this case on this 22nd day of May 2019.

        */s/James J. Niemeier*