IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | CASE NO. BK19-40297 |
| | ) | CHAPTER 11 |
| HERITAGE DISPOSAL AND STORAGE, LLC | ) | |
| | ) | |
| Debtor. | ) | |

**DECLARATION OF MARK A VESS IN SUPPORT OF OBJECTION TO MOTION FOR RELIEF FROM STAY AND LIMITED OBJECTION TO MOTION FOR ADEQUATE PROTECTION FILED BY FIVE POINTS BANK**

I, Mark A. Vess, in support of Debtor's objections to Motion for Relief from Stay and Motion for Adequate Protection by Five Points Bank, declares as follows:

1. This proceeding was commenced by voluntary petition on February 27, 2019.
2. Debtor filed this case to stop foreclosure of its property by Five Points Bank.
3. I have worked with explosives and laws and regulations regarding explosive material for approximately 41 years. I have served as an expert in judicial proceedings on explosive materials and handling as well as processes regarding explosive materials.
4. Debtor's business is the storage and conversion of various explosive materials and explosive constituents into products that can be used in the open market.
5. Debtor has a specific process to accomplish the above that is proprietary and lab-tested.
6. There is an MSDS for every element of fireworks and explosives handled at Debtor's facility. Debtor processes like materials together in batches to simplify the polishing process for the recycled materials. The materials are stored as explosives, not hazmat.
7. Debtor has reinstated full insurance policies that have always been in place, except for a temporary lapse in coverage.

**INSPECTION/SAMPLING:**

8. With respect to allowing Five Points to inspect/sample materials located in Debtor's facility, Debtor is not opposed to said inspection/sampling, however, because of the nature of Debtor's business and Department of Defense Contract as well as federal laws and regulations (ATF), Debtor cannot simply surrender possession of explosive materials or its facility to Five Points. Based on my experience in dealing with explosives and laws and regulations governing the same, there are the following considerations:

   a. There are approximately 638 containers of material at Debtor's facility in different stages of process and to obtain a true sampling, Five Points/its agent should sample all containers;

   b. Because of the nature of materials (explosive), there are mandatory safety and security protocol that must be followed. Containers cannot be opened in storage magazines. They cannot be transported off site and must be moved from the bunkers for on site for sampling / manipulation in a suitable work area out of the elements. The closest secure area with enough space for individual staging areas is the shipping and receiving building which would be approximately 1 mile away from the storage locations;

   c. From the moment personnel arrive at Heritage for any reason, to a magazine or building being opened, through all stages of testing/sampling: trained security guards oversee all operations and control access to Heritage, all secure areas and supervise and escort all personnel on site. They ensure security of all materials including all samples until all operations are completed. In general, security personnel are present for all activities at the entry control points, magazines, work areas, staging areas and observe operations involving each container and sample.

   d. Explosive materials must be safely transported. Packaging and banding must be checked prior to movement both to and from the staging areas. For efficiency and security the materials must be securely transported into a semi and trucked to the staging area, then tested, and re-secured and returned to the magazine all the time guarded;

  e. Explosive safety requires that the minimum amount of explosives be at risk to the minimum amount of personnel for the minimum amount of time. To facilitate that rule, pallets will be removed and manipulated one at a time. At the shipping and receiving facility there will be several separated work areas. The inspection area must be separate from the staging area, the sampling area separate from the inspection area and ultimately the repack / re-banding area separate from the other 2 areas;

  f. Debtor will require at least 7 employees to perform security and safety for the materials and transport and package / repackage all materials. Debtor will supervise and monitor and assist the sampling process. Debtor will store all samples and at the end of the operation accomplish all required paperwork to the certified lab that can receive the explosives materials. Debtor cannot lose possession of the property and will accomplish all chain of custody and manifest. Operations from cradle to grave require security guards at all times;

  g. The entire process can take up to 60 days, assuming no inclement weather and all personnel work 12-hour days;

  h. The labor, equipment, rental, personal protective equipment (required), utility and consumables costs as well as sampling/lab fees would need to be paid by Five Points;

9. Debtor is willing to allow inspection and sampling on the above terms.

10. Debtor has been inspected by Federal and State agencies over 30 times and has hosted Federal Agents in the performance of explosives operations on site utilizing all these procedures. Debtor facility is recognized as the safest and most compliant explosive work facility in the United States by many in the US DOJ and US DOD. Debtor's proven safe processes and procedures were developed to meet or exceed all Federal and State regulatory requirements. These safety and security processes were developed and are mandatory to comply with federal laws and regulations regarding the handling of these explosive materials.

11. Debtor has explosive materials at its facility and said materials must be handled as such.

12. Debtor must meet various requirements of the ATF Explosives Manufacture Licenses, Nebraska State Explosives Licenses and ATF 5400 regulations / law.

13. No member of Five Points has ever been denied access to Debtor's facility. I personally gave a tour to Bill Marshall of Five Points in the fall of 2015 and subsequently I have provided access to several Five Points executives during an unannounced visit in late 2016/early 2017.

14. No request from Five Points has been received by Debtor since the above.

**DIP FINANCING:**

15. As to DIP Financing, Debtor was in the final stages of securing financing in April of 2019. Debtor was in its seventh week of due diligence, 4 March – 18 April 2019 with the lender. The point of contact for the potential lender, Ian Abaie had indicated that funding documents had been prepared and would be forwarded by the end of the week 26 April 2019. Debtor and Chuck Moore from Benchmark Capital were informed on conference call by two members of the potential lender that a person purporting to be an attorney involved in Debtor's bankruptcy called lender and made representations to a Senior Executive of the Lender that Debtor would not be a suitable client and was not trustworthy and consistently unreliable. Due to past events of this specific nature by personnel affiliated with 5 Points Bank, Debtor believes this was someone affiliated with Five Points. This potential lender was disclosed at Debtor's 341 Hearing.

16. Debtor had a firm offer of financing in the summer of 2018, however, the vice president of Five Points Bank, David Cunningham, interfered with that financing as well and a settlement was reached between Debtor and Five Points regarding the same.

17. Debtor also had confirmation from US Army Contracting Officer that on the same day as the call to Lender she (US Army Contracting Officer) had received a similar call from a person purporting to be an attorney involved in Debtor's bankruptcy. That person indicated that Debtor had no ability to financially perform, was not trustworthy and strongly suggested that the US Government should investigate terminating the contract as soon as those facts were verified. She called me as soon as she got off the phone with the individual and disclosed this information to me. Unknown to the caller

was the fact that the Debtor has been fully transparent about the situation with the US Government.

18. Currently, Debtor has enlisted the help of Benchmark Commercial Capital to find DIP lenders and was thwarted in its efforts to secure funding in the loss of the lender referred to above.

19. Attached is a letter from Richard Simon of Benchmark Commercial Capital regarding the timeline and availability of potential DIP financing.

20. Benchmark is simultaneously working with three different potential lending sources as well as a potential direct investor and we should have a determination one way or the other within 2 weeks.

21. Debtor requires $6.6 million in DIP financing to build a facility to service its current DOD contract.

**EQUITY IN COLLATERAL:**

22. As stated on Debtor's schedules, there is equity in Debtor's assets, showing equity of approximately $10,352,439.35 of asset value over and above secured claims in the same.

23. In 2005, Five Points Bank ordered an appraisal of Debtor, which said valuation came in at a little over $11 million as a facility, and $12 million as a going concern.

24. In 2014, Five Points ordered yet another appraisal of Debtor utilizing the same firm and appraiser, and the valuation came in at approximately $3.4 million. After seeing the new, much lower valuation, I called the appraiser and was informed that he was following Five Points' instructions to artificially discount all comparables and discount Debtor's valuation.

25. Attached is a seven month financial study and MAI appraisal evaluation by Cascadia, Seattle, WA dated February, 2017, which shows a value between $44,475,000.00 just in facility value and a minimum of $51.6 million as an operation.

26. Debtor has no qualms with allowing Five Points fully escorted access to all areas except the magazines for an appraisal so long as it is at Five Points' cost as there have been multiple appraisals and in recent years.

**FLOOD INSURANCE:**

27. I admit that Debtor does not have flood insurance in place at this time, however, there is good reason for that.

28. I have been diligently working on either obtaining a flood insurance policy that makes sense fiscally, but also I have been working on obtaining a determination from FEMA as to whether Debtor's property is actually in a FEMA designated special flood hazard area.

29. In the past, Debtor did indeed carry flood insurance, however, the policy had a premium of $5,300.00 with $30,000.00 in coverage for a guard shack and the policy had a $30,000.00 deductible. The policy Debtor was forced to obtain was worthless.

30. Previously, Debtor had a few facilities that fell into a FEMA designated flood plain, however, that determination was based on an actual survey until 2006. Since 2006, the FEMA determination is only "on paper" and I have been working diligently to acquire an actual flood determination by physical survey from FEMA and have not yet had the results or survey completed.

31. FEMA's website with maps of flood hazard areas indicates the maps are "not necessarily considered as legal boundaries and are inexact representations of the official maps."

32. I am in the process of scheduling a meeting with Nebraska Dept. of Natural Resources in person to work on an actual physical surveying of Debtor's facility relative to the flood plain.

33. Any potential flood water damage to structures located upon Debtor's land would be minimal considering the only structures located in the previously determined flood plain are magazines consisting of earth covering 3 feet over 4.5 foot thick concrete with 12-16" concrete floors. Flood water damage to these structures is at most a replacement of soil. The structures alleged to be in the flood plain based on the most recent actual survey have been in place without damage since 1942.

34. There have been three floods in the area since 2003 and water has never approached any facility at Heritage.

35. Any structures built subsequent to the original structures in place from the Army were purposely built up areas and elevated / constructed and located to specifically NOT be in a flood plain area.

36. It is an open question as to whether any of Debtor's structures currently are located in a flood plain area and thus, Debtor's not having flood insurance is not a violation of the terms of the Deeds of Trust between Debtor and Five Points and I am working on an actual survey of the same.

37. If Debtor's structures are indeed not in a flood plain, which I am confident they are not, then the value of Debtor's operation and facility is increased. Thus, my work on obtaining an actual physical survey is beneficial for both Debtor and Five Points.

**FUTURE OPERATIONS OF HERITAGE:**

38. Debtor's plan is to build a facility by early spring, 2020 to service a Department of Defense contract for the demilitarization of explosives.

39. The DOD's initial contract commitment is potentially for $21 million, which has been filed with this Court in a Motion to Assume.

40. In October of 2018 the environmental coordination and licensing for the proposed facility was completed.

41. Once completed, Debtor's facility will be the only facility in the United States for the recycling and destruction of hexachlorethane smoke materials.

42. Once Debtor obtains DIP financing, it will be ready and able to immediately commence building of the facility.

43. All necessary engineering, coordination with EPA and State of Nebraska and other preparatory requirements have been completed. Debtor just needs funding to build the facility.

44. Beyond the DOD contract Debtor has assumed, there is another $500-$600 million in contracts that Debtor could fulfill with its facility.

45. Debtor has already obtained Resource Conservation and Recovery Act licensing for the facility, which cost Debtor over $1.5 million.

46. President Trump has funded $274 million for demilitarization contracts this year alone and currently there are only three potential beneficiaries of these contracts: General Dynamics, EXPAL and Debtor.

I declare under penalty of perjury that the foregoing is true and correct. (Declaration per 28 U.S.C. § 1746).

Dated: 6/14/2019



Mark A. Vess, Member and Authorized Agent for Debtor in Possession, Heritage Disposal and Storage, LLC